## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AMERICANS FOR PROSPERITY FOUNDATION, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>ANTHONY ALBENCE, in his official capacity as State Election Commissioner for the State of Delaware, et al.<br><br>*Defendants*. | Case No.<br><br>ORAL ARGUMENT REQUESTED |

## PLAINTIFFS' OPENING BRIEF IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

BAKER & HOSTETLER LLP

Jeremy D. Anderson (No. 4515)
1201 North Market St., Suite 1407
Wilmington, DE 19801-1147
(302) 407-4224
janderson@bakerlaw.com

Allen J. Dickerson
Washington Square
1050 Connecticut Ave., N.W., Suite 1110
Washington, DC 20036-5403
(202) 861-1507

Erika D. Prouty
Robert J. Tucker
Anna E. Croyts
200 Civil Center Dr., Suite 1200
Columbus, OH 43215-4138
(614) 228-1541

*Attorneys for Plaintiffs*

Dated: April 17, 2026

## **TABLE OF CONTENTS**

SUMMARY OF THE ARGUMENT ............................................................................................ 1

FACTUAL BACKGROUND ...................................................................................................... 2

    A.   Plaintiffs' First Amendment Activity. ................................................................. 2

    B.   Delaware's Regulation of Electioneering Communications and Third-Party Advertisements. ................................................................................................... 3

    C.   The Act's Impact on Plaintiffs and Their Donors. .............................................. 5

ARGUMENT .............................................................................................................................. 7

I.     Plaintiffs Are Likely To Succeed On The Merits. ..................................................... 8

    A.   The Act is subject to exacting scrutiny. .............................................................. 8

    B.   The Act fails exacting scrutiny because it is far from narrowly tailored. ......................... 10

    C.   The Act is not narrowly tailored, is overbroad, and fails on its face. ............................. 15

    D.   The Act Is Unconstitutional as Applied to Plaintiffs. ........................................ 17

II.    Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction. ........................... 18

III.   The Other Preliminary Injunction Factors Weigh In Plaintiffs' Favor. ............................... 19

CONCLUSION ......................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
    42 F.3d 1421 (3d Cir. 1994)................................................................................................19

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*,
    513 F. Supp. 3d 593 (W.D. Pa. 2021), *aff'd,* 39 F.4th 95 (3d Cir. 2022) .........................19, 20

*Ams. for Prosperity Found. v. Becerra*,
    903 F.3d 1000 (9th Cir. 2018) ...........................................................................................14

*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021)................................................................................................ *passim*

*Ams. for Prosperity Found. v. Harris*,
    182 F. Supp. 3d 1049 (C.D. Cal. 2016) ..............................................................................6, 17

*Ams. for Prosperity v. Grewal*,
    2019 WL 4855853 (D.N.J. Oct. 2, 2019)............................................................................6, 17

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)............................................................................................................8

*Buckley v. Valeo*,
    424 U.S. 1 (1976).......................................................................................................1, 9, 10

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010)......................................................................................................10, 11

*Del. Strong Fams. v. Del. Att'y Gen.*,
    793 F.3d 304 (3d Cir. 2015)...................................................................................... *passim*

*Doe v. Reed*,
    561 U.S. 186 (2010)............................................................................................................9

*Elrod v. Burns*,
    427 U.S. 347 (1976)...........................................................................................................18

*Gaspee Project v. Mederos*,
    13 F.4th 79 (1st Cir. 2021).............................................................................................9, 12, 13

*GJJM Enters., LLC v. City of Atl. City*,
    293 F. Supp. 3d 509 (D.N.J. 2017) .....................................................................................19

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, et al.*,
    546 U.S. 418 (2006)............................................................................................................8

*K.A. v. Pocono Mt. Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013)........................................................................18, 20

*Lakewood Citizens Watchdog Grp. v. City of Lakewood*,
    2021 WL 4060630 (D. Colo. Sept. 7, 2021) ..........................................................12

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995)..........................................................................................10

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958)........................................................................................8, 17

*NAACP v. Button*,
    371 U.S. 415 (1963)............................................................................................9

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
    290 F.3d 578 (3d Cir. 2002)...............................................................................19

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017)...............................................................................7, 8

*Rigby v. Jennings*,
    630 F. Supp. 3d 602 (D. Del. 2022)..................................................................19, 20

*Rio Grande Foundation v. Oliver*,
    154 F.4th 1213 (10th Cir. 2025) ..........................................................................14

*Rivertown TCI, L.P. v. Optymyze PTE Ltd.*,
    2026 WL 74500 (3d Cir. Jan. 9, 2026) ..................................................................19

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)............................................................................................8

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006)...........................................................................................8, 9

*Sec'y of State v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984)..........................................................................................15

*Shelton v. Tucker*,
    364 U.S. 479 (1960)............................................................................................9

*Singer Mgmt. Consultants, Inc. v. Milgram*,
    650 F.3d 223 (3d Cir. 2011)..................................................................................8

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty*,
    56 F.4th 400 (6th Cir. 2022) ...............................................................................11

iii

*Swartzwelder v. McNeilly*,
  297 F.3d 228 (3d Cir. 2002)...................................................................................19, 20

*Tenafly Eruv Assoc., Inc. v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002)........................................................................................19

*United States v. Hansen*,
  599 U.S. 762 (2023).....................................................................................................15

*United States v. Stevens*,
  559 U.S. 460 (2010)................................................................................................15, 17

*Van Hollen v. Fed. Election Comm'n*,
  811 F.3d 486 (D.C. Cir. 2016) ....................................................................................1, 2

*Virginia* v. *Hicks*,
  539 U.S. 113 (2003).....................................................................................................15

*Wyo. Gun Owners v. Gray*,
  83 F.4th 1224 (10th Cir. 2023) ............................................................................ *passim*

**Statutes**

15 Del. C. § 8002(10) ......................................................................................................17

15 Del. C. § 8002(10)a....................................................................................................3

15 Del. C. § 8002(10)(a)(1) ............................................................................................13

15 Del. C. § 8002(1l)(a)(1) ..........................................................................................4, 12

15 Del. C. § 8002(1l)(d)...............................................................................................4, 12

15 Del. C. § 8002(17) ......................................................................................................3

15 Del. C. § 8002(27) ......................................................................................................3

15 Del. C. § 8031(a).........................................................................................................3

15 Del. C. § 8031(a)(3).................................................................................................3, 10

15 Del. C. § 803l(a)(4).................................................................................................3, 4

15 Del. C. § 8043(c).....................................................................................................4, 6

Del. Admin. Code 100-9.1.5 ...........................................................................................4

Del. Admin. Code 100-10.1 ............................................................................................4

Del. Admin. Code 100-10.1-10.3................................................................................................6

Del. Admin. Code 100-10.3 ......................................................................................................4

**Other Authorities**

Del. Const. art. II, § 2.............................................................................................................4

Clare O'Connor, *Occupy the Koch Brothers: Violence, Injuries, and Arrests at DC Protest*, FORBES (Dec. 10, 2011, at 6:25 EST), http://www.forbes.com/sites/clareoconnor/2011/11/05/ occupy-the-kochs-violent-clashes-injuries-and-arrests-at-protest-against-corporate-greed/...........................................................5

*Re: Request for Ruling on Simpler and Lavelle Campaign Finance Issues*," STATE OF DEL. DEP'T OF ELECTIONS (Oct. 26, 2018), https://elections.delaware.gov/public/com_opinions/pdfs/AO2018-01%20LavelleSimpler.pdf. ...................................................................................7

## SUMMARY OF THE ARGUMENT

Even in political cases, the First Amendment protects "privacy of association and belief" and disfavors "compelled disclosure." *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per curiam). For this reason, the Supreme Court recently clarified that donor disclosure regimes are subject to exacting scrutiny requiring "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," *and* that the demand "be narrowly tailored to the interest it promotes." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 611 (2021) (citations and quotation marks omitted).

Nevertheless, Delaware administers a staggeringly broad disclosure regime. It reaches any mention of a candidate for office—including an incumbent officeholder—in a public communication made a month before an election. A mere $500 in aggregate spending triggers the reporting requirement. Any speaker that falls within Delaware's regulatory maw must then publish the name and address of every one of its donors giving more than $100, in aggregate, for a variable period up to four years.

These requirements violate donors' privacy and serve no legitimate purpose. Delaware cannot credibly assert that every small donation made in 2023 was intended to support a communication in 2026, much less that each donor intended to support or oppose a specific, named official all those years later. This is especially true where, as here, thousands of donors across the nation have given to large organizations that engage in an enormous range of activity across most of the fifty states. Vanishingly few Delaware voters will ever review that bloated list, and if they do, the identities of an organization's general supporters will say nothing about who has chosen to support or oppose the policy positions of a given candidate in Delaware.

This statute has previously been upheld under an obsolete legal standard. *Del. Strong Fams. v. Del. Att'y Gen.*, 793 F.3d 304 (3d Cir. 2015). But *Bonta* replaced the "fragile arrangement that

treats speech, a constitutional right, and transparency, an extra-constitutional value, as equivalents." *Van Hollen v. Fed. Election Comm'n*, 811 F.3d 486, 501 (D.C. Cir. 2016). *Delaware Strong Families* did not apply narrow tailoring and is, accordingly, superseded.

Plaintiffs are happy to stand behind their own communications, but they will not speak in Delaware at the cost of subjecting their donors to unconstitutional invasions of privacy and risks of harassment. Thankfully, the First Amendment does not require them to make that choice. Delaware's disclosure regime is both unconstitutional on its face and as applied to Plaintiffs. A preliminary injunction precluding the enforcement of the statute is necessary to protect the First Amendment rights of Plaintiffs and their donors.

## FACTUAL BACKGROUND

### A.      Plaintiffs' First Amendment Activity.

Americans for Prosperity ("AFP") and Americans for Prosperity Foundation ("AFPF") are nonprofit corporations engaged in public advocacy throughout the United States. Each is organized under a different provision of the Internal Revenue Code, and the nature of their advocacy efforts accordingly differs, as described in the attached declaration. (Declaration of Ross Connolly ("Connolly Decl.") ¶¶ 5-6., attached as Exhibit B.) But both groups raise funds from thousands of individual donors across the country, and both groups spend those funds to engage the public on a wide range of policy topics. (*Id*. at ¶¶ 7-8, 16.) Both organizations publish and communicate using television, radio, mail, and the internet. (*Id*. at ¶ 8.) Some of these communications mention incumbent officeholders while discussing issues of public policy. (*Id*. at ¶ 10.)

Plaintiffs have not operated in Delaware but intend to do so, including in advance of the 2026 and subsequent primary and general elections. Specifically, Plaintiffs wish to produce and distribute communications by means of television, radio, mail, and the internet. (*Id*. at ¶ 12.) These communications will discuss specific officeholders, who are also candidates for election or

2

reelection, in the context of governmental action and issues of public policy and will cost more than $500. (*Id.* at ¶¶ 13-14.)

## B. Delaware's Regulation of Electioneering Communications and Third-Party Advertisements.

The Delaware Elections Disclosure Act (the "Act") requires "[a]ny person . . . who makes an expenditure for any third-party advertisement that causes the aggregate amount of expenditures for third-party advertisements made by such person to exceed $500 during an election period" to "file a third-party advertisement report with the Commissioner." 15 Del. C. § 8031(a). A "person" includes not just "individual[s]," but also a "corporation," a "company," and "any other organization or institution of any nature." 15 Del. C. § 8002(17).

The Act defines a "[t]hird-party advertisement" to include "an electioneering communication," 15 Del. C. § 8002(27), which is further defined as any communication "by any individual or other person (other than a candidate committee or a political party) that: 1. [r]efers to a clearly identified candidate; and 2. [i]s publicly distributed within 30 days before a primary election or special election, or 60 days before a general election to an audience that includes members of the electorate for the office sought by such candidate," 15 Del. C. § 8002(10)a.

Third-party advertisement reports must be "filed under penalty of perjury," and most importantly here, include "[t]he full name and mailing address of each person who has made contributions to such person during the election period in an aggregate amount or value in excess of $100; the total of all contributions from such person during the election period, and the amount and date of all contributions from such person during the reporting period." 15 Del. C. § 8031(a)(3). If the contributor is not an individual, the report must include "the full name and mailing address of . . . [a]ny person who, directly or otherwise, owns a legal or equitable interest of 50 percent or greater in such entity; and . . . [o]ne responsible party, if the aggregate amount of

3

contributions made by such entity during the election period exceeds $1,200." 15 Del. C. § 803l(a)(4). The reports must be filed within "48 hours" if the expenditure is made "more than 30 days before a primary or special election or 60 days before a general election," and within "24 hours" if the expenditure is made "30 days or less before a primary or special election or 60 days or less before an election." 15 Del. Admin. Code 100-9.1.5.

The length of the applicable "election period" depends on the candidate identified in the third-party advertisement. *See* 15 Del. C. § 8002(11)(d) ("For a person who makes an expenditure for a third-party advertisement, the election period shall begin and end at the same time as that of the candidate identified in such advertisement."). For candidates running for reelection, the election period is "the period beginning on January 1 immediately after the most recent such election [to their current office], and ending on the December 31 immediately after the general election at which the candidate seeks reelection to the office." 15 Del. C. § 8002(1l)(a)(1). Because Delaware's state senators and statewide executive officeholders are elected every four years, *see* Del. Const. art. II, § 2; *id*. art. III, §§ 5, 19(a), 21, the applicable "election period" for incumbent candidates running for reelection for these offices can be as long as four years.

Failure to file the required reports results in assessment of "a fine by the Commissioner of $50 for each day that such report is tardy." 15 Del. Admin. Code 100-10.1. If a tardy report is not filed or corrected within 30 days following either a determination by the Commissioner that the tardiness is not due to reasonable cause or the expiration of the appeal period, "then the Commissioner shall notify the Office of the Attorney General that the reporting party has failed to file such report." 15 Del. Admin. Code 100-10.3. Failure to file the required reports is a class A misdemeanor. 15 Del. C. § 8043(c).

4

C.      **The Act's Impact on Plaintiffs and Their Donors.**

Although Plaintiffs' communications will not advocate the election or defeat of any candidate, they will mention incumbent officeholders who are themselves candidates running for election or reelection and will be distributed throughout the year, including in the pre-election window. (*See* Connolly Decl. ¶¶ 12-14.) Those communications made within 30 days of a primary election (or 60 days of a general election) would be considered "third-party advertisements" under Delaware law and require Plaintiffs to file third-party advertisement reports. Those reports would require publicly disclosing the names and addresses of AFP and AFPF's donors who have contributed more than $100 in the aggregate during the applicable "election period." From 2022 to 2025, thousands of donors—the overwhelming majority of whom reside outside of Delaware— have contributed more than $100 to Plaintiffs. (*Id*. at ¶ 16.) In other words, Plaintiffs would be required to disclose an individual located in Oregon that donated $105 in 2023.

Plaintiffs and their donors, however, have a reasonable fear that they will be the target of threats, harassment, or other retaliation if such information is disclosed. Plaintiffs, and their employees and supporters, have been subject to threats and harassment in the past. (Connolly Decl. ¶¶ 17-18.) For example, hundreds of protesters gathered outside of AFP's 2011 summit in Washington, D.C. and attempted to storm the building. The protest turned violent, and some attendees were physically accosted and injured.[1] AFP's office in Fargo, North Dakota was vandalized and spray painted because of AFP's support for free speech. (Connolly Decl. ¶ 20; *see also id*. at ¶ 22.) Courts, including the Supreme Court of the United States, have repeatedly

---

[1] *See* Clare O'Connor, *Occupy the Koch Brothers: Violence, Injuries, and Arrests at DC Protest*, FORBES (Dec. 10, 2011, at 6:25 EST), http://www.forbes.com/sites/clareoconnor/2011/11/05/occupy-the-kochs-violent-clashes-injuries-and-arrests-at-protest-against-corporate-greed/.

5

recognized the threats, harassment, and intimidation that Plaintiffs and their supporters have experienced. *Bonta*, 594 U.S. at 617 (explaining that AFPF had shown "that they and their supporters have been subject to bomb threats, protests, stalking, and physical violence"); *Ams. for Prosperity Found. v. Harris*, 182 F. Supp. 3d 1049, 1056 (C.D. Cal. 2016) (cataloging threats) (post-decision procedural history omitted); *see also Ams. for Prosperity v. Grewal*, 2019 WL 4855853, at *6 (D.N.J. Oct. 2, 2019) (describing Plaintiffs' evidence where "AFP itself and its donors have been subjected to harassment ranging from death threats to cyberattacks to violent protests at AFP events").

These threats and harassment have continued in recent years, including in Vermont, where Plaintiffs needed to hire security for their events due to consistent harassment and threats from groups who disagree with Plaintiffs on economic policy initiatives. (Connolly Decl. ¶ 19.) Legislators have attempted to stop AFP's operations in Northeastern states by introducing legislation targeting AFP, including in Vermont and Maine where legislators singled out AFP as the basis for preventing non-profits from advocating in their states. (*Id*. at ¶ 21.)

Because of these fears, donors often require confidentiality as part of their giving. (*Id*. at ¶ 23.) Accordingly, Plaintiffs maintain donor information in a highly secure database and access is restricted to individuals who have a need to know that information. (*Id*.) If Plaintiffs are required to disclose the names and addresses of their donors, it is likely that at least some donors will refuse to contribute to Plaintiffs, and current donors will cease contributing, because they are too fearful of the reprisal they will face if their names and addresses are disclosed. (*Id*. at ¶ 24.)

If Plaintiffs do not file the required reports disclosing their donors, they face a credible threat of enforcement including fines and other enforcement actions by Delaware state officials. 15 Del. Admin. Code 100-10.1-10.3; 15 Del. C. § 8043(c). Delaware has previously concluded

that a PAC was required to file a third-party advertisement report for an advertisement that merely referred to a candidate for State Treasurer aired during the 2018 election.[2] To Plaintiffs' knowledge, Delaware has never disavowed enforcement of its disclosure requirements for Plaintiffs' planned conduct. Rather, Delaware has previously enforced the requirements, *see* Exhibit A, and rigorously defended the constitutionality of the statute, *see generally Del. Strong Fams.*, 793 F.3d 304. Fearing both civil and potential criminal penalties, Plaintiffs will not publish communications in Delaware while these requirements are in effect. (Connolly Decl. ¶ 26.)

## **ARGUMENT**

To obtain a preliminary injunction, the moving party must show (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably harmed if the relief is not granted. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). The district court should also consider, if relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. *Id*. The first two factors are the most critical. *Id*. at 179. To satisfy the first factor, a movant must "demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)." *Id*. The Third Circuit does not require "a more-likely-than-not showing of success

---

[2] *See* "*Re: Request for Ruling on Simpler and Lavelle Campaign Finance Issues*," STATE OF DEL. DEP'T OF ELECTIONS (Oct. 26, 2018), https://elections.delaware.gov/public/com_opinions/pdfs/AO2018-01%20LavelleSimpler.pdf. (copy attached as Exhibit A.) While the State Election Commissioner agreed "on a one-time basis . . . to waive the fines associated with the Foundation's tardy third-party reports" so long as they were accurate and complete, the Commissioner also warned that she would "not waive any fines for the Foundation for third-party advertisement reports that must be filed in the future." *Id*. at 4.

on the merits." *Id*. at n.3 (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc) (internal punctuation omitted)).

Moreover, in First Amendment cases, "plaintiffs must be deemed likely to prevail for the purpose of considering a preliminary injunction unless the government has shown that plaintiffs' proposed less restrictive alternatives are less effective than the statute." *Id*. at 180 (cleaned up) (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)). "This is because 'the burdens at the preliminary injunction stage track the burdens at trial,' and for First Amendment purposes they rest with the government." *Id*. (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, et al.*, 546 U.S. 418, 429 (2006)).

Plaintiffs satisfy each of these factors here.

## I.      **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

### A.      **The Act is subject to exacting scrutiny.**

"The First Amendment prohibits government from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances.'" *Bonta*, 594 U.S. at 605-06. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). And, "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

The Supreme Court has therefore "held laws unconstitutional that require disclosure of membership lists for groups seeking anonymity" because "they ma[k]e group membership less attractive, raising the same First Amendment concerns about affecting the group's ability to

express its message." *Rumsfeld v. FAIR*, 547 U.S. 47, 69 (2006). This constitutional protection applies with equal force to an organization's financial supporters. *Buckley*, 424 U.S. at 66-67.

Just five years ago, the Supreme Court clarified the standard for First Amendment challenges to compelled disclosure in *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021). Recognizing that the existing standard under *Buckley* required "a substantial relation between the disclosure requirement and a sufficiently important government interest," the Supreme Court affirmed that "[r]egardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." *Bonta*, 594 U.S. at 607-08 (plurality opinion).

Exacting scrutiny "requires that there be 'a substantial relation between the disclosure requirement and a sufficiently important government interest,'" *id*. at 611 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)), "and that the disclosure requirement be narrowly tailored to the interest it promotes," *id*. (citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)). "While exacting scrutiny does not require that the disclosure regimes be the least restrictive means of achieving their ends," it does require the government to show the disclosure requirement is "narrowly tailored to the government's asserted interest." *Id*. at 608. That is because the "'government may regulate in the [First Amendment] area only with narrow specificity,' and compelled disclosure regimes are no exception." *Id*. at 610 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

Exacting scrutiny applies equally to disclosure regimes in the campaign finance realm. *See Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1243-150 (10th Cir. 2023) (applying *Bonta*'s exacting scrutiny standard to Wyoming's campaign finance disclosure regime); *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021) (applying *Bonta*'s exacting scrutiny standard to Rhode Island's campaign finance regulatory disclosure scheme). Here, the Act requires Plaintiffs to disclose the names and addresses of their donors who have contributed more than $100 in the aggregate during

9

the applicable election period. *See* 15 Del. C. § 8031(a)(3). This compelled disclosure of Plaintiffs'

donors burdens Plaintiffs' First Amendment rights and demands application of exacting scrutiny.

**B.      The Act fails exacting scrutiny because it is far from narrowly tailored.**

Under exacting scrutiny, it is the State's burden to demonstrate that the Act furthers an

important governmental interest and is narrowly tailored to that interest. *Wyo. Gun Owners*, 83

F.4th at 1247. The State cannot do so.

The only potential interest the State could even presumably rely upon here is the

informational interest in "provid[ing] the electorate with information as to where political

campaign money comes from and how it is spent by the candidate in order to aid the voters in

evaluating those who seek . . . office." *Buckley*, 424 U.S. at 66-67 (citations omitted). But "[t]he

simple interest in providing voters with additional relevant information does not justify a state

requirement that a writer make statements or disclosures she would otherwise omit." *McIntyre v.*

*Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995). The State's purported informational interest

here does not reach any donor information of conceivable interest to anyone. The informational

interest is limited to that which will "help citizens make informed choices in the political

marketplace." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 367 (2010) (internal

citation and quotation omitted). As *Buckley* explained, the informational interest is limited to

disclosure that "allows voters to place each candidate in the political spectrum more precisely than

is often possible solely on the basis of party labels and campaign speeches" and can "alert the voter

to the interests to which a candidate is most likely to be responsive and thus facilitate predictions

of future performance in office." *Buckley*, 424 U.S. at 66-67.

The State is demanding the disclosure of thousands of donors, from across the nation, who

gave to Plaintiffs without any knowledge or expectation that some tiny portion of their gifts might,

10

years later, be spent in connection with a communication in Delaware. It would require disclosure of a donor located in the state of Washington who donated to the organization three years ago. The State cannot credibly assert that any Delaware voter will evaluate a candidate differently based upon such information.

Moreover, a "critical feature of the narrow tailoring inquiry turns on whether the government 'seriously undertook to address' the problem it faces 'with less intrusive tools readily available to it.'" *Wyo. Gun Owners*, 83 F.4th at 1247 (cleaned up) (quoting *Sisters for Life, Inc. v. Louisville-Jefferson Cnty*, 56 F.4th 400, 404 (6th Cir. 2022) (Sutton, C.J.)). "This means that, beyond proving a balanced relationship between the disclosure scheme's burdens and the government's interests, the government must 'demonstrate its need' for the disclosure regime 'in light of any less intrusive alternatives.'" *Id.* (quoting *Bonta*, 594 U.S. at 613). Here, as in *Bonta*, there is a "dramatic mismatch" between any informational interest that the State "seeks to promote" and the disclosure requirements that have been "implemented in service of that end." *Bonta*, 594 U.S. at 612.

First, the Act requires disclosure of the names and addresses of donors who have contributed as little as $100.01 in the aggregate during any election period regardless of whether those donors earmarked their donations for a specific candidate or purpose. But disclosing the names of donors who contributed such low dollar amounts does little to inform the electorate about the relevant candidates or "help citizens make informed choices in the political marketplace." *Citizens United*, 558 U.S. at 367 (citations omitted). This is especially true here where the Act requires disclosure of all donors above the $100 level within the applicable election period, including those who contribute generally to the organization and not to support or oppose a particular candidate (or, indeed, any class of candidates in any given state). In other words, it is

11

"not clear that a donor to [AFP or AFPF] is a person talking about a candidate" at all. *Lakewood Citizens Watchdog Grp. v. City of Lakewood*, 2021 WL 4060630, at *12 (D. Colo. Sept. 7, 2021).

Delaware cannot "demonstrate its need" for the burden imposed by such expansive disclosure requirements in light of "less intrusive alternatives." *Bonta*, 594 U.S. at 613. A state's institution of "earmarking systems" and "opt out" provisions are methods of tailoring disclosure requirements to a state's informational interest. *See Wyo. Gun Owners*, 83 F.4th at 1248-49; *Gaspee Project*, 13 F.4th at 89. But Delaware lacks either option. Instead, the Act simply requires *all* donations as small as $100.01 to be reported, regardless of whether the donors supported the communication or candidate at issue. This over-disclosure "necessarily sweep[s] in speakers who may have been interested in supporting a different candidate or no candidate at all or perhaps wished to preserve their privacy or anonymity." *Wyo. Gun Owners*, 83 F.4th at 1248. For this very reason, the Tenth Circuit held that a statutory regime requiring disclosure of any contributions exceeding $100 without any opt-out or earmarking mechanism was not narrowly tailored. *Id*. at 1247-50. The same is true here.

Second, the State cannot demonstrate that the applicable "election period[s]" are narrowly tailored to any informational interest. Those periods are defined by the election periods for "the candidate identified in such [third-party] advertisement[s]," 15 Del. C. § 8002(1l)(d), which equates to a *four-year* election period for incumbent statewide executive officeholders and state senators, *see* 15 Del. C. § 8002(1l)(a)(1). Compelling disclosure of Plaintiffs' donors for as far back as four years prior to an election provides little information of value to voters about those donors, who may no longer support Plaintiffs or their mission, and who are unlikely to have given for the purpose of any specific public communication or candidate, in Delaware or elsewhere, let alone for candidates in the upcoming elections. Nor is there any supportable rationale for different

12

lookback periods for different offices. Voters are no better informed if the advertisement only mentions a candidate for a state house seat, requiring disclosure of donations over two years, versus a state senate election requiring disclosure of donors looking back four years.

Third, the Act requires disclosure if the third-party advertisement merely "refers to a . . . candidate," *see* 15 Del. C. § 8002(10)(a)(1), regardless of whether the advertisement expressly advocates for their election or defeat, or merely just mentions their name when educating citizens about matters of public policy. The Act covers advertisements that discuss the policy views of specific officeholders who happen to also be candidates for election or reelection, even if they say nothing about the officeholder's campaign or candidacy.

This lack of tailoring, in time or in scope, distinguishes the Act from state disclosure regimes that have been upheld under exacting scrutiny. In *Gaspee Project*, for example, the First Circuit recognized the importance of "opt-out" rights to disclosure regimes. The appellants argued that Rhode Island's disclosure and disclaimer provisions applied to general funds and were problematic because many general-fund donors may not endorse all of an organization's election-related expenditures. 13 F.4th at 89. The First Circuit rejected this assertion because it "fail[ed] to take into account the fact that—unlike [Federal law]—the Act provides ample opportunity for donors to opt out from having their donations used for independent expenditures or electioneering communications, even if the entity to which they contributed has not created a segregated fund." *Id*. Of course, even that mechanism would be illusory where, as here, donors gave years ago and had no meaningful opportunity to opt out of activity no one, including AFP and AFPF, intended at the time. Moreover, the threshold for reporting under the Rhode Island statute is $1,000, *id*., an order of magnitude higher than the mere $100.01 required here.

13

Likewise, in *Rio Grande Foundation v. Oliver*, the Tenth Circuit recognized that New Mexico's disclosure regime "focuses on large donors who do not opt out of supporting advertisements and who support expenditures designed to influence the relevant electorate, within a short period of time prior to an election." 154 F.4th 1213, 1227 (10th Cir. 2025) (internal quotation and citation omitted). The Tenth Circuit found that New Mexico's regime met exacting scrutiny because it was narrowly tailored through guardrails and an opt-out provision, only requiring disclosure of donors who either (1) donated more than $200 to a fund expressly earmarked for independent expenditures or (2) donated more than $5,000 to a general fund and did not request the contribution not to be used for independent or coordinated expenditures. *Id*. at 1218, 1228. The Delaware Act is not so tailored.

Finally, the State may argue that the Third Circuit's decision from 2013 in *Delaware Strong Families v. Attorney General of Delaware*, 793 F.3d 304 (3d Cir. 2015) forecloses Plaintiffs' claims. That decision, however, "is a relic of pre-*Bonta* exacting scrutiny," *Wyo. Gun Owners*, 83 F.4th at 1249, and applied an obsolete legal standard. At the time, the Third Circuit believed that exacting scrutiny only required "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Del. Strong Fams.*, 793 F.3d at 309 (internal citations omitted). That was the same standard applied by the Ninth Circuit, *see Ams. for Prosperity Found. v. Becerra*, 903 F.3d 1000, 1008-09 (9th Cir. 2018), and ultimately reversed by the Supreme Court in *Bonta*, 594 U.S. at 619. The Third Circuit did not require the government to "demonstrate its need for" the disclosure regime's burden "in light of any less intrusive alternatives." *Bonta*, 594 U.S. at 613. For that reason, the Third Circuit held that its analysis did "not change simply because an earmarking limitation would result in a more narrowly tailored

14

statute." *Del. Strong Fams.*, 793 F.3d at 312. The State must now demonstrate the Act is narrowly tailored. It cannot do so.

### C.    <u>**The Act is not narrowly tailored, is overbroad, and fails on its face.**</u>

"Normally, a plaintiff bringing a facial challenge must establish that no set of circumstances exists under which the [law] would be valid, or show that the law lacks a plainly legitimate sweep." *Bonta*, 594 U.S. at 615 (internal quotations and citations omitted). But not in the First Amendment context. Rather, for First Amendment claims, the Supreme Court has recognized "a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted). A law is unconstitutionally overbroad if it regulates substantially more speech than the Constitution allows to be regulated. *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 964-65 (1984). This analysis is unique to First Amendment claims and stems from the concern that an overbroad law will chill constitutionally protected speech:

> We have justified this doctrine on the ground that it provides breathing room for free expression. Overbroad laws "may deter or 'chill' constitutionally protected speech," and if would-be speakers remain silent, society will lose their contributions to the "marketplace of ideas." *Virginia* v. *Hicks*, 539 U.S. 113, 119 (2003). To guard against those harms, the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak. *Williams*, 553 U.S., at 292. If the challenger demonstrates that the statute "prohibits a substantial amount of protected speech" relative to its "plainly legitimate sweep," then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid. *Ibid.*; *see Hicks*, 539 U.S., at 118-119.

*United States v. Hansen*, 599 U.S. 762, 769-770 (2023).

In *Bonta*, the Supreme Court had "no trouble concluding . . . that the Attorney General's disclosure requirement [was] overbroad." 594 U.S. at 615. As the Supreme Court held, "[t]he lack

of tailoring to the State's investigative goals is categorical—present in every case—as is the weakness of the State's interest in administrative convenience. Every demand that might chill association therefore fails exacting scrutiny." *Id*.

So too here. The State's failure to tailor the Act to the State's legitimate informational interest is "categorical" and "present in every case." *Id*. Delaware's disclosure requirements create an "'unnecessary risk of chilling'" by "indiscriminately sweeping up the information of *every* major"—and, here, minor—"donor with reason to remain anonymous." *Id*. at 616-17. This risk of chill is even more serious here, where ever-evolving technology permits "'anyone with access to a computer'" to "'compile a wealth of information about' anyone else" using their name and home address. *Id*. at 617 (citation omitted). The Act imposes a "widespread burden on donors' associational rights" that is not justified on the ground of narrow tailoring to the State's informational interest. *Id*. at 618. That is all that is required for the Act to fail on its face.

The State may attempt to "downplay the burden on donors" and argue, as California did in *Bonta*, that there is no "broad-based chill." *Id*. at 615. But as *Bonta* recognizes, any burden on First Amendment rights is enough "chill," especially where a statute is not narrowly tailored and is, therefore, overbroad. *Id*. at 615. *Bonta* rejected the requirement, advocated by the dissent, that plaintiffs show "that donors to a substantial number of organizations will be subjected to harassment and reprisals." *Id*. at 617. The majority held that "plaintiffs may be required to bear th[at] evidentiary burden where the challenged regime *is* narrowly tailored." *Id*. (emphasis added). But, as in *Bonta*, because the Delaware regime is not narrowly tailored, § I.B. *supra*, such a demanding showing is not required.

16

The Act's disclosure requirement fails in a "substantial number of its applications . . . judged in relation to [its] plainly legitimate sweep," *Stevens*, 559 U.S. at 473, and is unconstitutional on its face.

### D.      The Act Is Unconstitutional as Applied to Plaintiffs.

Even if the Act is not unconstitutional on its face, it is unconstitutional as applied to Plaintiffs here. Plaintiffs intend to publish and distribute communications that will be considered "electioneering communications," 15 Del. C. § 8002(10), and that will therefore require Plaintiffs to file third-party advertisement reports disclosing the names and addresses of their donors, (Connolly Decl. ¶¶ 12-15). This compelled disclosure of Plaintiffs' donors violates the First Amendment freedom of association and belief enjoyed by Plaintiffs and their supporters. *See Patterson*, 357 U.S. at 462. Plaintiffs, their employees, supporters, and donors have been subject to threats and harassment in the past and in recent years. (*Id*. at ¶¶ 18-22); Background § C *supra*. They have experienced violent protests at their events, cyberattacks on their systems, and vandalism at their offices. (Connolly Decl. ¶¶ 20, 22); *see also Harris*, 182 F. Supp. 3d at 1055-56; *Grewal*, 2019 WL 4855853, at *6. Their founders and employees have received death threats, and supporters who have been identified have experienced harassment and intimidation. (Connolly Decl. ¶ 22); *Harris*, 182 F. Supp. 3d at 1055-56; *Grewal*, 2019 WL 4855853, at *6. For good reason, Plaintiffs and their donors fear that they will be the target of threats, harassment, or other retaliation if Plaintiffs are forced to disclose the names and addresses of their donors.

The Act also directly chills Plaintiffs' constitutionally protected speech. Plaintiffs have thousands of donors who have contributed more than $100 and the vast majority reside outside of Delaware. (Connolly Decl. ¶ 16.) Thus, the cost of that speech in Delaware is a choice between disclosing all of AFP and AFPF's donors nationwide—including a donor from Ohio who

17

contributed three years ago—or facing fines and other potential penalties by the State. To avoid this choice, Plaintiffs will not publish communications in Delaware in advance of the 2026 or subsequent elections absent a court order enjoining enforcement of the Act. As a result, Plaintiffs' constitutionally protected speech is and will continue to be chilled.

Finally, if Plaintiffs are required to disclose the names and addresses of their donors, it is likely that current and potential donors will refuse to contribute because they are too fearful of the threats and reprisals they will face if their names and addresses are disclosed. (*See* Connolly Decl. ¶ 24.) Precisely because Plaintiffs' donors did not give for the purpose of future Delaware advocacy, (*see id*. at ¶ 16), they will be surprised and displeased to have their privacy suddenly violated and are likely to discontinue or limit their future association with AFP and AFPF. This will chill Plaintiffs' and their donors' associational activity by discouraging individuals from associating with Plaintiffs, and simultaneously chill the protected speech of donors who forgo making contributions.

For all the above reasons, the Act places a significant burden on Plaintiffs' First Amendment rights and those of its donors. That burden cannot be justified under exacting scrutiny. *See* § I.C *supra*. The Act is also unconstitutional as applied to Plaintiffs.

## II.     PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT A PRELIMINARY INJUNCTION.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also K.A. v. Pocono Mt. Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013). If this Court finds that Plaintiffs' First Amendments rights are likely to be infringed, then irreparable harm is a given. Plaintiffs and their donors will be irreparably harmed by the enforcement of the Act here.

18

### III.    THE OTHER PRELIMINARY INJUNCTION FACTORS WEIGH IN PLAINTIFFS' FAVOR.

The remaining factors weigh in favor of a preliminary injunction. In analyzing potential harm to others, courts "balance [the] hardships" that interested persons would suffer if the injunction were granted versus denied. *See Rigby v. Jennings*, 630 F. Supp. 3d 602, 619 (D. Del. 2022). Where First Amendment rights are at issue, that balance is not close. "The assertion of serious First Amendment questions has been held to compel a finding that the balance of hardships tips sharply in the plaintiff's favor." *GJJM Enters., LLC v. City of Atl. City*, 293 F. Supp. 3d 509, 521 (D.N.J. 2017); *see also Tenafly Eruv Assoc., Inc. v. Borough of Tenafly*, 309 F.3d 144, 177 (3d Cir. 2002) (analyzing impairment to First Amendment rights and finding "the balance [of hardships] easily tips in the plaintiffs' favor"). In comparison, Defendants and others stand no risk of irreparable harm as the legislature remains "free to attempt to draft new regulations that are better tailored to serve [its] interests." *Swartzwelder v. McNeilly*, 297 F.3d 228, 242 (3d Cir. 2002). This factor weighs overwhelmingly in Plaintiffs' favor.

The public interest factor likewise aligns squarely with granting injunctive relief. Because the first two factors favor the granting of an injunction, so too does the public interest factor. *See Rivertown TCI, L.P. v. Optymyze PTE Ltd.*, 2026 WL 74500, at *2 (3d Cir. Jan. 9, 2026) (citing *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.")); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 597 (3d Cir. 2002) ("where the plaintiff has demonstrated a likelihood of success on the merits, the public interest leans even more toward granting the injunction"). Protecting First Amendment freedom always promotes the public interest. *Amalgamated Transit*

19

*Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 513 F. Supp. 3d 593, 622 (W.D. Pa. 2021) ("[T]here is a significant public interest in upholding First Amendment principles."), *aff'd,* 39 F.4th 95 (3d Cir. 2022). Conversely, "the enforcement of an unconstitutional law vindicates no public interest." *Rigby*, 630 F. Supp. 3d at 619 (citing *K.A. ex rel. Ayers*, 710 F.3d at 114). So "[t]he public interest is best served by eliminating the unconstitutional restrictions" within the Act. *Swartzwelder*, 297 F.3d at 242.

Both the potential harm to others and the public interest factors favor granting a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin Defendants from enforcing the Act.

DATED: April 17, 2026

Allen J. Dickerson*
1050 Connecticut Ave., N.W., Suite 1110
Washington, DC 20036-5403
(202) 861-1507
adickerson@bakerlaw.com

Erika D. Prouty*
Robert J. Tucker*
Anna E. Croyts*
200 Civil Center Dr., Suite 1200
Columbus, OH 43215-4138
(614) 228-1541
eprouty@bakerlaw.com
rtucker@bakerlaw.com
acroyts@bakerlaw.com

*Pro hac vice motions forthcoming

BAKER & HOSTETLER LLP

*/s/ Jeremy D. Anderson*
Jeremy D. Anderson (No. 4515)
1201 North Market St., Suite 1407
Wilmington, DE 19801-1147
(302) 407-4224
janderson@bakerlaw.com

*Attorneys for Plaintiffs*

20