## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF DELAWARE

|  |  |
|---|---|
| AMERICANS FOR PROSPERITY FOUNDATION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:26-cv-00445-JLH |
| ANTHONY ALBENCE, in his official capacity as State Election Commissioner for the State of Delaware, *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' BRIEF IN OPPOSITION TO
## MOTION FOR PRELIMINARY INJUNCTION

Tara Malloy*
Megan McAllen*
David Kolker*
Elizabeth Shimek*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
tmalloy@campaignlegalcenter.org
mmcallen@campaignlegalcenter.org
eshimek@campaignlegalcenter.org

*Pro hac vice* application filed

**Delaware Department of Justice**
Emily V. Burton
Delaware Department of Justice
820 N. French Street, 6th Floor
Wilmington, DE 19801
302-577-5374
Emily.Burton@Delaware.gov

*Counsel for Defendants*

**TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDINGS ...............................................................1

SUMMARY OF ARGUMENT......................................................................................1

STATEMENT OF FACTS .............................................................................................2

    I.      Delaware Elections Disclosure Act ...............................................................2

          A.  Legislative and Legal Background .......................................................2

          B.  The Current Act ....................................................................................4

    II.     Plaintiffs Americans for Prosperity Foundation and Americans for Prosperity ............6

ARGUMENT....................................................................................................................7

    I.      Standard of Review.......................................................................................7

    II.     Plaintiffs Have Not Shown a Reasonable Probability That They Will Succeed on the Merits of their Facial Claim.........................................................................................7

          A.    *Delaware Strong Families* forecloses plaintiffs' facial challenge......................7

          B.    *Bonta* did not "supersede" *Delaware Strong Families* but rather reaffirmed that exacting scrutiny is the correct standard of review for the Act..................8

          C.    The Act is constitutional because it is narrowly tailored to advance the important governmental interest in an informed electorate ............................11

    III.    Plaintiffs Are Not Likely to Succeed on the Merits of their As-Applied Claim ..........15

    IV.    Plaintiffs Have Not Shown the Non-Merits Factors Required for Preliminary Relief 18

CONCLUSION................................................................................................................20

**TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Pages**

*ACLU of New Jersey v. Black Horse Pike Regional Board of Education*, 84 F.3d 1471 (3d Cir. 1996) ................................................................................................................................7

*Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021)............................1, 7, 8, 9, 11

*Americans for Prosperity Foundation v. Harris*, 809 F.3d 536 (9th Cir. 2015)..............................16

*Americans for Prosperity v. Grewal*, 2019 WL 4855853 (D.N.J. Oct. 2, 2019).............................16

*Americans for Prosperity v. Meyer*, 724 F. Supp. 3d 858 (D. Ariz. 2024)................................15, 17

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979)........................................19

*Bennington Foods LLC v. St. Croix Renaissance, Group, LLP*, 528 F.3d 176 (3d Cir. 2008).......20

*Brown v. Socialist Workers '74 Campaign Committee (Ohio)*, 459 U.S. 87 (1982)......................15

*Buckley v. Valeo*, 424 U.S. 1 (1976).................................................................................2, 8, 10, 18

*Center for Individual Freedom v. Tennant*, 706 F.3d 270 (4th Cir. 2013) ....................................13

*Citizens United v. FEC*, 558 U.S. 310 (2010).......................................................3, 8, 11, 14, 15, 20

*Delaware Strong Families v. Attorney General of Delaware*, 793 F.3d 304 (3d Cir. 2015) ("*DSF*") ....................................................................................................................... *passim*

*Delaware Strong Families v. Denn*, 136 S. Ct. 2376 (2016)............................................................4

*Fenza's Auto, Inc. v. Montagnaro's, Inc.*, No. 10-cv-3336, 2011 WL 1098993 (D.N.J. Mar. 21, 2011) ............................................................................................................8

*Hohe v. Casey*, 868 F.2d 69 (3d Cir. 1989) ....................................................................................18

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)..............................................................13

*Independence Institute v. FEC*, 216 F. Supp. 3d 176 (D.D.C. 2016).............................................3

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) .............................................................................13

*Lanin v. Borough of Tenafly*, 515 F. App'x 114 (3d Cir. 2013)....................................................20

*McConnell v. FEC*, 540 U.S. 93 (2003) .......................................................................2, 3, 11, 13

*Minard Run Oil Company v. United States Forest Service*, 670 F.3d 236 (3d Cir. 2011) .............20

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958).........................................................15

*No on E, San Franciscans Opposing the Affordable Housing Production Act v. Chiu*, 62 F.4th 529 (9th Cir. 2023) ..............................................................................................13, 18

*ProtectMarriage.com v. Bowen*, 830 F. Supp. 2d 914 (E.D. Cal. 2011) ......................................15

*Punnett v. Carter*, 621 F.2d 578 (3d Cir. 1980) ...............................................................................7

*Rubin v. Buckman*, 727 F.2d 71 (3d Cir. 1984) ...............................................................................8

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ..............................................................19

*Van Hollen v. FEC*, No. 12-5117, 2012 WL 1758569 (D.C. Cir. May 14, 2012) .........................13

*Wyoming Gun Owners v. Gray*, 83 F.4th 1224 (10th Cir. 2023) ..............................................10, 13

**Statutes, Rules, and Codes**

11 C.F.R. § 104.20(c)(9) ................................................................................................................13

15 Del. C. § 8002(10) .......................................................................................................1, 3, 4, 12

15 Del. C. § 8002(11) ......................................................................................................................14

15 Del. C. § 8002(18) ........................................................................................................................5

15 Del. C. § 8002(27) ........................................................................................................................4

15 Del. C. § 8005 ..............................................................................................................................5

15 Del. C. § 8030 ..............................................................................................................................5

15 Del. C. § 8030 (2012) ..................................................................................................................3

15 Del. C. § 8031 (2012) ..................................................................................................................3

15 Del. C. § 8031(a) ......................................................................................................................5, 14

15 Del. C. § 8031(a)(3) ..................................................................................................................1, 4

26 U.S.C. § 501(c)(3) ......................................................................................................................20

52 U.S.C. § 30102 ............................................................................................................................5

52 U.S.C. § 30103 ............................................................................................................................5

52 U.S.C. § 30104(f)(2)(E) ..........................................................................................................5, 10

52 U.S.C. § 30104(f)(2)(F) ...........................................................................................................3, 10

52 U.S.C. § 30104(f)(3) ....................................................................................................................3

52 U.S.C. § 30116(a)(1)(C)-(D) .......................................................................................................5

**Other Authorities**

About Americans for Prosperity, https://americansforprosperity.org/about/
(last visited May 20, 2026) ...............................................................................................6

About Americans for Prosperity Action, https://afpaction.com/about-us/
(last accessed May 20, 2026) ............................................................................................6

Americans for Prosperity Action Financial Summary,
https://www.fec.gov/data/committee/C00687103/ .......................................................6

Americans for Prosperity Form 990 (Nov. 17, 2025), https://projects.propublica.org/
nonprofits/organizations/753148958/202533219349310913/full..............................................6

Americans for Prosperity Foundation Form 990 (Nov. 17, 2025),
https://apps.irs.gov/pub/epostcard/cor/521527294_202412_990_2026030223953501.pdf......6

Electioneering Communications, 72 Fed. Reg. 72899 (Dec. 26, 2007) ........................................13

Felicia Sonmez, *Who is "Americans for Prosperity"?*, Washington Post (Aug. 26, 2010),
https://web.archive.org/web/20100831093514/http://voices.washingtonpost.com/thefix/senat
e/who-is-americans-for-prosperit.html .........................................................................6

H.B. 300, 146th Gen. Assemb. (Del. 2012) .................................................................................3

I.R.S. Rev. Rul. 2007-41, 2007-25 I.R.B. (June 18, 2007) ...........................................................20

Jane Mayer, *Covert Operations*, The New Yorker (Aug. 23, 2010),
https://www.newyorker.com/magazine/2010/08/30/covert-operations?_sp=8e856085-e68c-
4ef4-982b-fe2c65daca67.1779224946070................................................................................6

**NATURE AND STAGE OF PROCEEDINGS**

Plaintiffs Americans for Prosperity ("AFP") and Americans for Prosperity Foundation ("AFPF") seek a declaratory judgment that the disclosure requirements for third-party ads in the Delaware Elections Disclosure Act ("Act") are unconstitutional on their face and as applied. Plaintiffs moved for a preliminary injunction on April 17, 2026; defendants hereby respond.

**SUMMARY OF ARGUMENT**

Plaintiffs ask this Court to preliminarily enjoin the electioneering communications ("EC") disclosure provisions of the Act, *see* 15 Del. C. §§ 8002(10), (27), 8031(a)(3), despite binding precedent upholding these provisions in *Delaware Strong Families v. Attorney General of Delaware*, 793 F.3d 304, 313 (3d Cir. 2015) ("*DSF*"). This Court should deny plaintiffs' motion for preliminary relief because their facial claim is foreclosed by *DSF*; plaintiffs cannot show a reasonable probability of success on the merits of their as-applied claim; they have failed to demonstrate a probability of imminent, irreparable harm; and AFPF has failed to allege an injury sufficient to confer Article III standing.

1. Plaintiffs' facial claim improperly attempts to relitigate controlling Third Circuit precedent based on nothing more than speculation about the impact of the Supreme Court's intervening decision in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021).

In 2015, *DSF* considered a First Amendment challenge to the Act. The Court of Appeals applied exacting scrutiny, identified the government's important informational interest in electoral disclosure, and held that the Act was "narrowly tailored" to achieve this interest. *DSF*, 793 F.3d at 306. Six years later, when reviewing a California tax reporting law, the Supreme Court in *Bonta* held that a tax reporting law should be reviewed under exacting scrutiny and analyzed for narrow tailoring, as prior cases had directed for election-related disclosure. 594 U.S. at 608.

1

Plaintiffs do not dispute this, but nonetheless assert that *Bonta* somehow "superseded" *DSF* and rendered the standard of review applied there "obsolete." Pls' Br. Supp. Mot. for Prelim. Inj. ("PI Br.") 1, 2. Their claim, at bottom, is that *DSF* did not apply exacting scrutiny or review that Act for narrow tailoring—even though the Third Circuit expressly said it did.

This argument verges on frivolous. *DSF* forecloses plaintiffs' facial challenge. Insofar as *Bonta* is relevant here, it simply reaffirms that the Third Circuit was correct to apply exacting scrutiny in *DSF* and correct to review the Act for narrow tailoring.

2. Plaintiffs' as-applied claim fares no better. Neither AFPF nor AFP have met their burden to demonstrate "a reasonable probability that the compelled disclosure of [their donors'] names will subject them to threats, harassment, or reprisals." *Buckley v. Valeo*, 424 U.S. 1, 74 (1976) (per curiam). Indeed, the vast majority of plaintiffs' allegations are too general and conclusory to even state a particularized claim for as-applied relief.

3. Finally, plaintiffs fail to demonstrate irreparable harm because they do not allege any imminent plan to spend money on covered communications. Plaintiffs have developed no advertisements, and cannot even identify a single Delaware candidate or policy matter about which they wish to advocate. They offer no justification for their sudden need for immediate relief, nor for their delay in seeking to challenge a law that has been in effect for over a decade.

## STATEMENT OF FACTS

### I.     Delaware Elections Disclosure Act

#### A.     Legislative and Legal Background

Prior to 2002, federal law permitted groups to run election ads "while hiding behind dubious and misleading names," *McConnell v. Federal Election Comm'n ("FEC")*, 540 U.S. 93, 197 (2003), because the law had been narrowed by court decisions to require disclosure of only those ads that "expressly advocated" for and against candidates, *Buckley*, 424 U.S. at 41-43.

2

Congress enacted the Bipartisan Campaign Reform Act of 2002 ("BCRA") to remedy this easily evaded standard and extended federal reporting requirements to "electioneering communications": ads that refer to a federal candidate, run within 30 days of a primary election or 60 days of a general election, and are targeted to the relevant electorate. 52 U.S.C. § 30104(f)(3).

The Supreme Court upheld these provisions on their face in *McConnell*, 540 U.S. at 194-202, and as applied in *Citizens United v. FEC*, 558 U.S. 310, 366-71 (2010). *See Indep. Inst. v. FEC*, 216 F. Supp. 3d 176 (D.D.C. 2016) (three-judge court), *summarily aff'd*, 580 U.S. 1157 (2017). Both decisions held that the BCRA disclosure requirements satisfied exacting scrutiny because they were sufficiently tailored to advance the important "informational interest" in ensuring voters "know[] who is speaking about a candidate shortly before an election." *Citizens United*, 558 U.S. at 369. Both decisions also upheld BCRA's requirement that groups financing ECs from a general fund must disclose "the names and addresses of *all* contributors" over the monetary threshold, without regard to whether donors had specifically "earmarked" their funds for ECs. 52 U.S.C. § 30104(f)(2)(F) (emphasis added).

Prior to 2013, Delaware law had similarly required disclosure only as to the narrow class of ads that "expressly advocate[d]" a candidate's nomination or election. 15 Del. C. §§ 8002(10), 8030, 8031 (2012). Like Congress, the Delaware Legislature became concerned—as did numerous Delawareans who testified in support of the Act[1]—about "a proliferation of advertisements that [we]re distributed during the campaign season and intended to influence elections, but [we]re not required to be reported." H.B. 300, Pmbl., 146th Gen. Assemb. (Del. 2012). In 2013, following the

---

[1] The Legislature heard testimony from Delawareans and others expressing concerns that the funders of election-related ads remained hidden from voters, as well as expert reports on the legislation's constitutionality. *See* Ex. 2 to Decl. of Anthony J. Albence, attached hereto (Marziani testimony); *see also* Albence Decl., Ex. 2 at Ex. A (Committee hearing minutes).

3

model of federal law and guided by the analysis in *McConnell* and *Citizens United*, the Legislature extended existing Delaware disclosure requirements to encompass "electioneering communications." *See* 15 Del. C. §§ 8002(10), (27); 8031(a)(3); *see also* Albence Decl., Ex. 1.

Soon after enactment, Delaware Strong Families ("DSF") challenged the Act as overbroad and contrary to the First Amendment. The district court granted DSF's motion for a preliminary injunction, but Delaware appealed and the Third Circuit reversed.

In its analysis, the Court of Appeals closely followed *Citizens United*, recognizing that this precedent had considered a "federal statute comparable to the Act." *DSF*, 793 F.3d at 308. As Supreme Court precedent instructed, the Third Circuit applied exacting scrutiny and identified the important governmental interest in "provid[ing] the electorate with information as to where political campaign money comes from." *Id.* at 309 (internal quotation marks omitted). It then analyzed whether the Act was both "substantially related" and "sufficiently tailored" to that interest, carefully "compar[ing] the respective disclosure requirements of BCRA and the Act." *Id.* at 308. After examining the Act's monetary thresholds, the media it covered, its reporting periods, and the donor disclosure required, the Third Circuit held that the Act was "narrowly tailored and not impermissibly broad." *Id.* at 306. The Supreme Court subsequently denied the *DSF* plaintiffs' petition for certiorari. *DSF v. Denn*, 136 S. Ct. 2376 (2016).

### B.      The Current Act

Like BCRA, the Act requires certain disclosures from organizations that spend more than a specified amount on "third-party advertisements," 15 Del. C. § 8002(27), a category which includes "electioneering communications," ads that refer to a clearly identified candidate, are publicly distributed by communications media within 30 days of a primary election or 60 days of a general election, and are targeted to the relevant electorate. *Id.* § 8002(10).

4

Organizations that spend more than \$500 on covered communications must file reports with the Commissioner of Elections. *Id*. § 8031(a). Reports must list the names of those to whom the organization has paid more than \$100 for third-party advertisements; those contributing more than \$100 to the organization during the election period; and, if a contributor is an organization, any person owning more than a 50% interest in the contributor. *Id*. § 8031(a).[2]

Delaware law also allows persons who wish to make ECs or independent expenditures to create a political action committee ("PAC"), *id*. § 8002(18), or an unincorporated association for this purpose. Albence Decl. ¶¶ 15, 16, 19. Under the Act, a PAC is required to register and file regular disclosure reports with the Commissioner, 15 Del. C. §§ 8005, 8030, but need not organize as a formal entity and may terminate at any time.[3] By creating a PAC or association to issue ECs, a non-profit can circumscribe the disclosure of its donors. Albence Decl. ¶ 19. Federal law similarly provides groups with a measure of control over the disclosure of their donors by allowing them to establish a "segregated bank account" to finance ECs and to disclose only those persons who contribute to the account. 52 U.S.C. § 30104(f)(2)(E).

Many third-party advertisers in recent Delaware elections created a PAC or association to finance their ECs and thereby limit the disclosure of the ultimate sources of their funds. Albence Decl. ¶¶ 19-21. Concerned that this option may unduly reduce donor disclosure with respect to ECs, Delaware's General Assembly is actively considering legislation to address the use of PACs and other associations to limit disclosure under Act. *Id*. ¶¶ 25-26, Ex. 16.

---

[2] Exhibits 14-15 to the Albence Declaration are examples of these reports.

[3] Unlike federal political committees, Delaware PACs need not adhere to organizational formalities such as maintaining a separate bank account, nor is their fundraising subject to contribution limits. *See* 52 U.S.C. §§ 30102, 30103; *id*. § 30116(a)(1)(C)-(D) (federal contribution limits); Albence Decl. ¶¶ 16, 22.

## II.       Plaintiffs Americans for Prosperity Foundation and Americans for Prosperity

AFPF and AFP are large national organizations founded in 2004 by billionaire David Koch, a major owner of Koch Industries.[4]

AFPF is a group organized under Section 501(c)(3) of the Internal Revenue Code. In 2024, AFPF reported $4,378,810 in total revenue. *See* AFPF Form 990, https://apps.irs.gov/pub/epostcard/cor/521527294_202412_990_2026030223953501.pdf.

AFP is a group organized under Section 501(c)(4) of the IRC. In 2024, AFP reported $223,730,668 in total revenue, *see* AFP Form 990, *available at* https://projects.propublica.org/nonprofits/organizations/753148958/202533219349310913/full. AFP has long been recognized as a "major player" in U.S. politics, spending heavily at both the federal and state levels.[5] It reports four million "activists" in all fifty states, more than 100 offices across the country, and thirty-six individual state chapters; in 2024 alone, AFP hosted more than 7,500 events and claimed more than 300 legislative victories, according to its public website.[6]

Plaintiffs also operate at least one affiliated PAC. Their federally-registered super PAC, Americans for Prosperity Action ("AFPA"), took in over $180 million in receipts in 2023-24.[7]

### ARGUMENT

## I.  Standard of Review

Four factors govern whether a preliminary injunction should issue: "(1) whether the

---

[4] *See* Jane Mayer, *Covert Operations*, The New Yorker (Aug. 23, 2010), https://www.newyorker.com/magazine/2010/08/30/covert-operations?_sp=8e856085-e68c-4ef4-982b-fe2c65daca67.1779224946070.

[5] *See* Mayer, *supra*. *See also* Felicia Sonmez, *Who is "Americans for Prosperity"?*, Wash. Post (Aug. 26, 2010), https://web.archive.org/web/20100831093514/http://voices.washingtonpost.com/thefix/senate/who-is-americans-for-prosperit.html.

[6] *See* About AFP, https://americansforprosperity.org/about/ (last visited May 20, 2026); and AFP State Chapters, https://americansforprosperity.org/state-chapters/ (last visited May 20, 2026).

[7] *See* AFPA Financial Summary, https://www.fec.gov/data/committee/C00687103/. *See also* About AFP Action, https://afpaction.com/about-us/ (last visited May 20, 2026).

movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." *ACLU of NJ v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1477 n.2 (3d Cir. 1996). "[W]hen the preliminary injunction is directed not merely at preserving the status quo but, as in this case, at providing mandatory relief, the burden on the moving party is particularly heavy." *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980). Plaintiffs seek affirmative relief and have not carried their burden on any of these prongs.

## II.  Plaintiffs Have Not Shown a Reasonable Probability That They Will Succeed on the Merits of their Facial Claim.

### A.  *Delaware Strong Families* forecloses plaintiffs' facial challenge.

In *DSF*, the Third Circuit sustained the Act under exacting scrutiny and expressly analyzed whether the Act was "narrowly tailored and not impermissibly broad." 793 F.3d at 306. That decision controls here.

Plaintiffs cannot dispute that the Third Circuit applied exacting scrutiny. The only argument plaintiffs muster against the preclusive effect of *DSF* is their theory that *Bonta* materially changed the standard of scrutiny applicable to political disclosure laws by "clarifying" that exacting scrutiny entails "narrow tailoring" review. PI Br. 1, 9. According to plaintiffs, this "clarification" implicitly "supersedes" the Third Circuit decision in *DSF*. *Id*. at 1.

This theory is plainly wrong. *Bonta* simply repeated the Supreme Court's consistent holding that "exacting scrutiny" applies to the review of compelled disclosure laws. 594 U.S. at 608. That was the level of scrutiny that *DSF* applied to review the Act. Insofar as *Bonta* "clarified" that exacting scrutiny requires review for narrow tailoring, the Third Circuit explicitly undertook such review.

*DSF* remains binding on this Court unless it is "obviously in conflict with Supreme Court precedent." *Rubin v. Buckman*, 727 F.2d 71, 74 (3d Cir. 1984) (Garth, J. concurring). *See also Fenza's Auto, Inc. v. Montagnaro's, Inc.*, No. 10-cv-3336, 2011 WL 1098993, at *7 (D.N.J. Mar. 21, 2011) (noting that a district court "may set aside Third Circuit precedent only if the Supreme Court has effectively overruled" it). Plaintiffs do not identify *any* conflict between *Bonta* and *DSF*, nor could they, given that *Bonta* affirmed the standard of review applied in *DSF*. Their argument instead relies on the charge that *DSF* did not undertake the narrow tailoring analysis required by *Bonta*—even when the Third Circuit explicitly said that it had. *DSF*, 793 F.3d at 306.

**B.** **_Bonta_ did not "supersede" _Delaware Strong Families_ but rather reaffirmed that exacting scrutiny is the correct standard for review of the Act.**

*Bonta* considered a California tax law that required charities active in the state to submit tax documents and donor information to the state attorney general, on a confidential basis, to aid the state's oversight over nonprofit entities. 594 U.S. at 601-02. In challenging this law, the plaintiffs had urged the Supreme Court to apply strict scrutiny, distinguishing, for the purpose of their argument, campaign finance laws like Delaware's that received exacting scrutiny. But the Court declined to create the two-tier system of review. Instead, drawing upon campaign finance precedents like *Buckley* and *Citizens United*, it reaffirmed that that the exacting scrutiny it applied in those cases was the appropriate standard for all types of donor disclosure laws. *Id.* at 608 (citing *Buckley*, 424 U.S. at 64-68; *Citizens United*, 558 U.S. at 366-67; *Davis v. FEC*, 554 U.S. 724, 744 (2008)). It further explained that that "exacting scrutiny requires that there be a substantial relation between the disclosure requirement and a sufficiently important governmental interest, and that the disclosure requirement be narrowly tailored to the interest it promotes." *Id.* at 611 (internal citations and quotation marks omitted). Thus, far from criticizing the standard of scrutiny applied in campaign finance cases like *Citizens United*—and *DSF*—the Supreme Court instead explicitly

8

instructed that this standard should apply uniformly both within and beyond the arena of political disclosure. *Id.*

Despite *Bonta's* reaffirmation of exacting scrutiny, plaintiffs claim that the Supreme Court rendered the standard of review applied in *DSF* "obsolete." PI Br. 1. Their apparent theory is that *Bonta* effectively *added* a new element to exacting scrutiny by "clarifying" that it requires narrow tailoring review—so the *DSF* decision is suspect because it preceded this "clarification." *Id.* at 14-15. As noted above, however, this argument fails because *DSF* explicitly reviewed the Act for narrow tailoring. Moreover, *Bonta* never suggested that it was *altering* the exacting scrutiny standard. On the contrary, the plurality expressly rejected the dissent's position that earlier political disclosure cases like *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010), had employed a standard that required only a "modest level of tailoring." 594 U.S. at 611. Instead, the plurality maintained that cases like *Reed* had in fact rigorously reviewed tailoring because the Court in those cases had upheld disclosure "only after [it] concluded that various narrower alternatives proposed by the plaintiffs were inadequate." *Id.*

Plaintiffs' interpretation of *Bonta* as "adding" narrow tailoring to exacting scrutiny would have impacts far beyond this case, affecting *all* disclosure precedents predating *Bonta*—not just *DSF*. Indeed, *McConnell* and *Citizens United*, the precedents upon which the Third Circuit chiefly relied, display all of the supposed defects that plaintiffs claim are present in the *DSF* opinion. Neither *McConnell* nor *Citizens United* expressly stated that exacting scrutiny requires narrow tailoring. Nor did these decisions enumerate all "less intrusive alternatives" to the federal law as plaintiffs demand, *see* PI Br. 14. Finally, contrary to plaintiffs' argument, *id.* at 12, neither decision limited federal disclosure to only those contributions that are explicitly "earmarked" for campaign purposes. *See infra* at 12-13. The federal law upheld by the Supreme Court, like the Act here,

requires groups running ECs to disclose *all* of their donors over the statutory threshold, unless they used a segregated account or PAC, *see* 52 U.S.C. § 30104(f)(2)(E), (F). Plaintiffs' contention that *Bonta* makes *DSF* "obsolete" would requiring also finding that *Bonta* rendered *Citizens United* obsolete. This is the logical endpoint of plaintiffs' attempt to sidestep binding Circuit precedent.

Lacking any Supreme Court authority for their argument, plaintiffs rely heavily on dicta in a Tenth Circuit case, *Wyoming Gun Owners v. Gray*, 83 F.4th 1224 (10th Cir. 2023), that had mischaracterized *DSF* as a "a relic of pre-*Bonta* exacting scrutiny." PI Br. 14 (quoting *Gray*, 83 F.4th at 1249). The Tenth Circuit's critique of the Third Circuit's analysis rests on a faulty understanding of *Bonta*, which did not change the standard of scrutiny, and *DSF*, which in fact analyzed the Act for narrow tailoring. In any event, *DSF*, not *Gray*, governs here.[8]

Substantively, the Tenth Circuit was most concerned that *DSF* had approved of donor disclosure without an earmarking limitation, but this criticism is also unfounded. No court has held that a state may only compel the disclosure of those contributions specifically "earmarked" for campaign purposes, and *McConnell* and *Citizens United* indicate the opposite. *See infra* at 12-13. Indeed, even as *Gray* levied this critique, it was also forced to concede that there was no constitutional basis to hold that "legislatures must include an earmarking provision to survive narrow tailoring." 83 F.4th at 1249 n.8.

---

[8] The Tenth Circuit's concerns about the scope of donor disclosure may be attributed to the void-for-vagueness argument present in *Gray*—an issue with no analogue here. The Tenth Circuit's chief objection to Wyoming's disclosure law was possible vagueness, not only overbreadth. *See* 83 F.4th at 1237 (finding provision requiring disclosure of donors whose donations "relate to" electioneering communications "impermissibly vague"). Because Wyoming's imprecise provision potentially, but inadvertently, required near-plenary disclosure of donors, the Tenth Circuit held that it was not narrowly tailored. But this concern does not justify its critique of *DSF*: far from implicating vagueness concerns, the Delaware Act employs the same "easily understood and objectively determinable" criteria as the federal EC law upheld in *McConnell*. 424 U.S. at 194.

10

**C. The Act is constitutional because it is narrowly tailored to advance the important governmental interest in an informed electorate.**

Both before and after *Bonta*, the Supreme Court's campaign-finance precedents all confirm that electoral disclosure requirements are subject to "exacting scrutiny," which "requires that there be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest,' and that the disclosure requirement be narrowly tailored to the interest it promotes." *Bonta*, 594 U.S. at 611 (internal citations omitted). The Third Circuit in *DSF* correctly applied this standard. As discussed *supra*, *DSF* controls here, but even if it did not, the Act is narrowly tailored to advance the government's well-recognized state interest in informing voters "about the sources of election-related spending." *Citizens United*, 558 U.S. at 367.

The Act's threshold criteria and numerous narrowing features ensure its disclosure requirements are tightly tied to their informational objectives. The Act uses the exact same criteria as BCRA to define the scope of covered ECs. *See supra* at 2-3. Its voter-targeting threshold, the elections and media it covers, the 30- and 60-day pre-election time periods in which it applies, and its monetary thresholds for disclosure all confirm a close nexus between the Act's transparency objectives and local campaign practices. *Id*. These characteristics sharply distinguish Delaware's law from the regulation in *Bonta*, which created a "dramatic mismatch" between California's tax disclosure regime and its "weak[]" interest in administrative convenience of such disclosures. 594 U.S. at 614-15. Instead, like BCRA, the Act limits disclosure to speech made shortly before elections when communications are "specifically intended to affect election results." *McConnell*, 540 U.S. at 127. It captures spending only above certain thresholds tailored to Delaware's small size and relatively inexpensive elections. And, it permits groups like plaintiffs to form PACs or associations to segregate their electioneering activities and funds from general revenues and thereby tailor the reach of donor disclosure. *See* Albence Decl. ¶¶ 19-21.

The Delaware Legislature modeled the Act on BCRA, but the Act's monetary thresholds and covered media fit the unique circumstances of Delaware campaigns. These departures from BCRA are not only justified in light of the practical realities of state elections, but are also—as *DSF* recognized, 793 F.3d at 306—indicative of the Act's narrow tailoring. For instance, Delaware lacks its own major-network television market, and neighboring television markets are prohibitively expensive. Consequently, television advertising is rare in Delaware races. *See* Albence Decl. ¶¶ 7-8. Because less costly media, such as direct mail, instead accounts for a large share of campaign spending, groups need not spend large sums of money to reach Delaware voters. *See id*. The Act's adjustments to BCRA therefore support—and in no way constitutionally undermine—the narrow fit between the statute and the State's interest in an informed electorate.

Plaintiffs' attempt to relitigate *DSF* with respect to the Act's constitutional tailoring focuses on three principal attacks. According to plaintiffs, the Act categorically fails to advance its informational objectives, and thus fails constitutional scrutiny, because: (1) disclosure is not limited to contributors who specifically earmark funds "for a specific candidate or purpose" when giving to spenders who make covered electioneering ads, PI Br. at 11; (2) the Act's look-back period for disclosure mirrors the length of the relevant candidacy, *see id.* at 11-12; and (3) the Act "requires disclosure if the third-party advertisement merely 'refers to a . . . candidate,'" regardless of whether the advertisement expressly advocates for their election or defeat," *id.* at 13 (quoting 15 Del. C. § 8002(10)(a)(1)). These very arguments were rejected in governing Supreme Court and Third Circuit precedents, and should be rejected again here.

First, an earmarking mechanism in a disclosure law is not a prerequisite for narrow tailoring. In *McConnell* and *Citizens United*, the Supreme Court upheld the federal EC disclosure

law, without regard to any earmarking requirement.[9] *McConnell*, 540 U.S. at 196. Appellate courts have likewise understood *McConnell* and *Citizens United* as confirming the constitutionality of statutes requiring organizations to disclose all contributors, regardless of whether the contributions are earmarked. *See, e.g.*, *DSF*, 793 F.3d at 311-12 ("Nothing in *Citizens United* implies that the Court relied upon the FEC earmarking regulation when approving of BCRA's disclosure regime."); *No on E v. Chiu*, 62 F.4th 529, 545 (9th Cir. 2023) (noting that no court has held that a law "fails narrow tailoring unless it is limited to the disclosure of earmarked contributions"); *Ctr. for Indv'l Freedom v. Tennant*, 706 F.3d 270, 292 (4th Cir. 2013) (upholding disclosure without earmarking because "*McConnell* compels us to find that [it] is constitutional"). *Cf. Gray*, 83 F.4th at 1249 n.8.

Nor are plaintiffs correct that an earmarking limitation would necessarily make the Act more narrowly tailored. "Money is fungible[.]" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 31 (2010). Donors may reasonably be expected to know the causes advanced by the organizations to which they give money, and voters have an interest in knowing who is behind the electioneering messages they hear. Plaintiffs complain that their non-Delaware donors may be subject to disclosure absent an earmarking requirement, PI Br. 10-11, but the prospect of undisclosed, out-of-state money impacting state elections is precisely what concerns Delawarean voters. Albence Decl. ¶¶ 9-12. An earmarking limitation might enable groups to hide behind anodyne names and shield their funders—resurrecting the very problem that BCRA and the Act were meant to fix.

---

[9] The FEC promulgated a regulation in 2007 providing that corporations and unions making federal ECs need disclose only those contributions earmarked for covered communications. *See* 11 C.F.R. § 104.20(c)(9); 72 Fed. Reg. 72899 (Dec. 26, 2007). But this regulation was adopted four years after *McConnell* upheld BCRA on its face. 540 U.S. at 194-202. And although the FEC rule had been adopted by the time of *Citizens United*, it was already under challenge in court, and neither the parties nor the Supreme Court relied upon it. The D.C. Circuit has accordingly rejected the contention that "the Supreme Court's holding was limited by" the earmarking regulation. *Van Hollen v. FEC*, No. 12-5117, 2012 WL 1758569, at *3 (D.C. Cir. May 14, 2012).

13

Second, plaintiffs' focus on the temporal "look back" period for disclosure is equally unavailing. Delaware's look-back period sensibly tracks the relevant candidacy—for incumbents, the term of office; for challengers, the period beginning from receipt of the first qualifying contribution to a candidate committee. 15 Del. C. §§ 8002(11), 8031(a). Contributions made in those periods foreseeably may assist organizations engaging in election-related speech. And for purposes of the First Amendment, what matters is the public's interest in knowing who provided the money that made this speech possible. In contrast, limiting the look-back period to only a fraction of the relevant election cycle, as plaintiffs wrongly imply is a constitutional necessity, would obscure important information about early campaign fundraising and could easily be gamed to evade disclosure altogether.

Finally, the assertion that the Act is constitutionally infirm because it defines ECs based on the exact same "easily understood and objectively determinable" criteria that the Supreme Court has approved amounts to a frontal assault on *McConnell* and *Citizens United*. Plaintiffs' case hinges on drawing the same unworkable constitutional line between express advocacy and "issue speech" that the Supreme Court has repeatedly repudiated in the context of disclosure. *Citizens United* rejected the claim that disclosure could not extend to non-express advocacy, and held instead that "the public has an interest in knowing who is speaking about a candidate shortly before an election," "[e]ven if the ads only pertain to a commercial transaction." 558 U.S. at 369. Plaintiffs suggest that such transparency may not be informative or useful to voters, *see* PI Br. at 12, but its value to Delawareans is reflected in the legislative choices of their democratically elected representatives and confirmed by the legislative record. The Act itself is proof enough that the public values the disclosure information it provides.

## III.    Plaintiffs Are Not Likely to Succeed on the Merits of their As-Applied Claim.

Plaintiffs fail to show the kind of pervasive harassment required to receive an as-applied

14

exemption from the Act under *Buckley* and *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), nor do they plausibly demonstrate that any such harm would result from Delaware's disclosure requirements. Indeed, plaintiffs' allegations are so general and conclusory that they fail to even state a particularized claim for as-applied relief.

The Supreme Court has recognized one basis for an as-applied challenge to election-related disclosure: if a plaintiff shows "a reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed." *Citizens United*, 558 U.S. at 370. This exemption was designed to protect "dissident" viewpoints that would otherwise be removed from "the free circulation of ideas." *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 91, 93 (1982). Groups who have won this exemption have often confronted not only private hostility, but also governmental harassment and surveillance. *See id.* at 98-100; *NAACP*, 357 U.S. at 462. Politically powerful actors like AFP, however, are "a far cry from the sixty-member [Socialist Workers Party]," which was "repeatedly unsuccessful at the polls, and incapable of raising sufficient funds." *ProtectMarriage.com v. Bowen*, 830 F. Supp. 2d 914, 928 (E.D. Cal. 2011), *aff'd in part, dismissed in part as moot*, 752 F.3d 827 (9th Cir. 2014).

Plaintiffs fail to show that their organizations have suffered the kind of violence, harassment, and reprisals that warranted exemptions for the Socialist Workers Party and the NAACP. Indeed, far from meeting the standard for a preliminary injunction, most of plaintiffs' allegations of harm are so general and generic that they would not survive a motion to dismiss. For this reason, another federal district court recently rejected a similar as-applied claim by AFPF and AFP in their challenge to an Arizona law requiring election spenders disclose the original sources of funds used for campaign ads. *AFP v. Meyer*, 724 F. Supp. 3d 858, 879 (D. Ariz. 2024) (dismissing plaintiffs' as-applied claim because it was "based on generic allegations regarding the

15

treatment of their donors in unrelated matters"), *appeal docketed*, No. 24-2933 (9th Cir., argued May 15, 2025). Most of the allegations here similarly lack specificity. *See, e.g*., Compl. ¶ 40 ("Donors whose associations with Plaintiffs are known to the public have received threats of physical harm and/or public harassment"); *id*. ¶ 41.

Plaintiffs allege only a handful of more concrete, but still woefully insufficient, instances of supposed harassment. They make vague references to harassment and threats in Vermont, Connolly Decl. ¶ 19, ECF No. 5-2; an unruly protest at AFP's 2011 summit in Washington D.C., Compl. ¶ 38; and alleged vandalism of their Fargo, North Dakota office in 2019, *id*. But they provide virtually no support for these claims.[10] Moreover, several of the alleged incidents appear to involve *lawful* disagreement with plaintiffs' public positions, which is itself speech protected by the First Amendment. *See, e.g*., Compl. ¶¶ 40, 42 (alleging that certain donors' businesses were boycotted, legislation was introduced "targeting AFP," and Vermont and Maine legislators made statements "singl[ing] out AFP"). Plaintiffs also reference the records purportedly created in past cases concerning the activities of AFP and AFPF and dicta therein regarding harassment. *See* PI Br. at 17; Connolly Decl. ¶¶ 18-22. But no case has granted either AFP or AFPF an as-applied exemption from disclosure based on donor harassment.[11] Moreover, plaintiffs must make adequate submissions *here*, not merely gesture at unrelated cases elsewhere.

---

[10] The only support for the claimed harassment at the 2011 protest is a single news article, Compl. ¶ 39; and the only "evidence" for vandalism is half of a blog post that was re-published as an opinion column, where the link for the rest of the blog is broken, Connolly Decl. ¶ 20.

[11] Plaintiffs cite an unpublished New Jersey decision, but the court there made no findings as to whether AFP merited an as-applied exemption from the law at issue. *AFP v. Grewal*, 2019 WL 4855853, at *20 (D.N.J. Oct. 2, 2019). And in *Bonta*, the district court's grant of a preliminary injunction was reversed by the Ninth Circuit, which found that AFPF had not shown a reasonable probability of harassment by either the state or the general public if the Attorney General collected its donor information. *AFPF v. Harris*, 809 F.3d 536, 540-41 (9th Cir. 2015).

Thus, even if plaintiffs' allegations are assumed to be true and all inferences drawn in their favor, they would still fail to qualify for an as-applied exemption. The exemption was created for politically and socially marginalized groups that suffered pervasive and consistent harassment from both the government and private parties. Plaintiffs are national, well-funded organizations, with four million activists in all fifty states and a history of significant legislative success. *See supra* at 6. AFP and AFPF themselves voluntarily announce their leadership and board members on their website, *see supra* notes 6 & 7, demonstrating that their leadership has no genuine fear of reprisal from disclosure of their identities. Yet they scrape together only a handful of instances of supposed harassment over a more than 15-year period, none of which are substantiated with any evidence here. This is not to say that a mainstream group could never fall victim to serious harassment. But the prospect of severe chill in that case is comparatively remote and demands more substantial factual support.

Most crucially, plaintiffs fail to allege any harassment suffered by their donors because their names or other information appeared in a campaign finance report or similar disclosure. To the extent they cite any specific incidents of harassment, all almost exclusively involve the experiences of plaintiffs' leadership, employees, and public-facing associates—and were occasioned by their public advocacy and activities, not in response to information gleaned from disclosure reports filed with a government agency. But plaintiffs must show a reasonable probability that *disclosure under the Act* will be the cause of any donor harassment. As the Arizona district court explained when rejecting AFPF and AFP's as-applied claim there, although plaintiffs "need not make voluminous allegations of possible harm, they must make some allegations that can plausibly be tied to [Arizona law]," including a "factual basis for believing the disclosures required by [Arizona law] will lead to threats, harassment, or reprisals." *Meyer*, 724 F. Supp. 3d at

17

879 (internal quotations omitted). Plaintiffs repeat the same mistake here.

This omission is even more glaring because plaintiffs operate an affiliated super PAC that took in over $180 million in federal receipts in 2023-24; in the same period, the PAC reported the names of over two thousand donors. *See* AFPA Financial Summary, *supra* note 7. Plaintiffs make no allegation that these contributors have ever faced harassment from this disclosure, nor do they suggest that any of their public disclosure reports have otherwise caused harm to their donors.

Finally, plaintiffs make the unsupported allegation that compliance with the Act will make it "likely that current and potential donors will refuse to contribute." PI Br. 18. But the mere possibility that disclosure may discourage some donors from contributing is hardly sufficient to obtain an as-applied exemption. *Buckley,* 424 U.S. at 68 (upholding federal disclosure law even though it is "undoubtedly true" that disclosure might "deter" some donors from making contributions); *No on E*, 62 F.4th at 543 (holding that "donors' alleged desire not to have their names listed" is insufficient to establish a real deterrent effect on fundraising).

## IV.  Plaintiffs Have Not Shown the Non-Merits Factors Required for Preliminary Relief.

Plaintiffs have not demonstrated that they will suffer irreparable harm if a preliminary injunction is denied as to either their facial or as-applied claims. The mere "assertion of First Amendment rights does not automatically require a finding of irreparable injury," but rather, a plaintiff "must show 'a chilling effect on free expression.'" *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989) (citation omitted). Neither plaintiff has made this showing.

Plaintiffs do not allege that either AFP or AFPF has ever been politically active in Delaware. Unlike the plaintiff group in *DSF*, which had a track record of distributing voter guides about Delaware candidates—communications covered by the Act, 793 F.3d at 307—neither AFP nor AFPF alleges it has made disbursements for any type of political advocacy in Delaware, much less for ECs subject to the Act. *See* Albence Decl. ¶¶ 27-28. Nor have plaintiffs described any

18

future EC they intend to disseminate prior to Delaware's 2026 elections. Neither alleges that it has developed a single political ad or ad script, nor has either group identified any Delaware officeholder, legislative action, or policy issue about which it wishes to advocate. The only sample ads they provide were run in different states, and only one of the two even mentions a candidate. Connolly Decl. ¶¶ 9, 10. Plaintiffs have failed to demonstrate an imminent—or indeed *any*— threat of enforcement, as they appear to have no concrete plans to distribute ECs in Delaware at all.

Indeed, AFPF does not allege even a general intent to distribute an EC and therefore has not established an injury sufficient to establish Article III standing. Pre-enforcement First Amendment challenges are permitted if a plaintiff satisfies the injury-in-fact requirement by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). In the campaign context, the submission of "specific statements [that plaintiffs] intend to make in future election cycles" may suffice to show such a "course of conduct." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014).

AFPF has pleaded no such specific statements. The only example AFPF provides of the communications it may distribute in Delaware is an Arizona ad it ran about a ballot proposition that makes no mention of a candidate. Compl. ¶ 25 n.1. AFPF asserted it "intends to engage in similar work in Delaware on an ongoing basis," including within the covered pre-election periods, *id*. ¶ 26—but unlike Arizona, Delaware has no ballot issue elections, and this type of ad *is not subject to the Act*. AFPF further states that "[c]onsistent with its *federal tax status*, AFPF's communications will discuss specific officeholders," *id*. (emphasis added), but Section 501(c)(3) groups like AFPF are strictly prohibited under federal tax law from making any communications

19

"on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). It is unclear what type of ECs, if any, a 501(c)(3) group can run without running afoul of its tax status. *See, e.g.*, IRS Rev. Rul. 2007-41 at 9, 2007-25 I.R.B. (June 18, 2007). Certainly, AFPF provides no examples of such communications that it wishes to run in Delaware. Compl. ¶¶ 25, 26.

Nor does either plaintiff offer any reason for their extraordinary delay in bringing this challenge. The Act went into effect in 2013, and even insofar as the *Bonta* ruling instigated plaintiffs' decision to sue, it issued in 2021. This delay casts doubt on any claim that plaintiffs perceive an imminent risk of harm. *See Lanin v. Borough of Tenafly*, 515 Fed.Appx. 114, 118 (3d Cir. 2013) (affirming that a plaintiff's delay in seeking a preliminary injunction indicated little risk of immediate harm). That is especially so here, where plaintiffs seek a mandatory injunction. *Bennington Foods LLC v. St. Croix Renaissance Group*, 528 F.3d 176, 179 (3d Cir. 2008).

And it strains credulity that plaintiffs—sophisticated national groups with an affiliated PAC—might forgo the option of using a PAC or other type of segregated fund to limit donor disclosure as Delaware law allows. *See supra* at 5. If instead they choose to embrace "plenary" donor disclosure in connection to their Delaware advocacy, any "injury" resulting from that choice would be of their own making.

Finally, plaintiffs fail to show that "the public interest favors such relief." *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 250 (3d Cir. 2011). Granting plaintiffs' motion would both upend Delaware's campaign disclosure system shortly before the 2026 elections and deprive voters of disclosure that "enables [them] to make informed decisions and give proper weight to different speakers and messages." *Citizens United*, 558 U.S. at 370.

## CONCLUSION

For these reasons, plaintiffs' motion for preliminary injunction should be denied.

20

**Dated: May 26, 2026**

Respectfully submitted,

Tara Malloy\*
Megan McAllen\*
David Kolker\*
Elizabeth Shimek\*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
tmalloy@campaignlegalcenter.org
mmcallen@campaignlegalcenter.org
eshimek@campaignlegalcenter.org

*\*Pro hac vice* application filed

**Delaware Department of Justice**

*/s/ Emily V. Burton*
Emily V. Burton (No. 5142)
Delaware Department of Justice
820 N. French Street, 6th Floor
Wilmington, DE 19801
302-577-5374
Emily.Burton@Delaware.gov

*Counsel for Defendants*

21